**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NOVINGER GROUP, INC., et al.,** | : | **CIVIL ACTION NO. 1:06-CV-0188** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **HARTFORD INSURANCE, INC.,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Presently before the court is a motion (Doc. 16), filed by defendant Hartford

Insurance, Inc. ("Hartford"), to dismiss the complaint filed by plaintiffs Novinger

Group, Inc., James D. Novinger, and Patrick D. Hospodavis (collectively

"plaintiffs").  For the reasons that follow, the motion will be granted in part and

denied in part.

I.     **<u>Statement of Facts</u>**[1]

A.     **<u>The Parties</u>**

Plaintiffs James D. Novinger ("James") and Patrick D. Hospodavis

("Hospodavis") are the President and Chief Financial Officer of Novinger Group,

Inc. ("Novinger Group"), respectively.  (Doc. 1 ¶¶ 1-3.)  Novinger Group acts as plan

administrator of a nonqualified deferred compensation plan (hereinafter "DC

---

[1] In accordance with the standard of review for a motion to dismiss, the court
will present the facts as alleged in the complaint.  <u>See</u> FED. R. CIV. P. 12(b)(6);
<u>Empire Kosher Poultry, Inc. v. United Food & Comm'l Workers Health & Welfare
Fund of N.E. Pa.</u>, 285 F. Supp. 2d 573, 577 (M.D. Pa. 2003).  The statements
contained herein reflect neither the findings of the trier of fact nor the opinion of
the court as to the reasonableness of the allegations of the complaint.

Plan").[2]  (Id. at 1.)  Hartford is an insurance company that sold eight Variable

Universal Life Policies and one Buy-Sell Policy to Novinger Group as a component

of the DC Plan.  (Id. ¶ 7.)  The policies insured the following employees of Novinger

Group and/or CIESCO, Inc.:[3]  James, Hospodavis, Jeffery G. Depew, Frank J. Kruse

("Kruse"), Timothy G. Kephart, Robert R. Myers, Robert D. Boyle, and Richard A.

Simmons (collectively "plan participants").  (Id.)  The policies were intended to

assist in the business succession of Novinger Group from James to the other

insured employees.  (Doc. 23 at 8.)

    **B.**    **The Dispute**

    Essentially, plaintiffs allege that they were "baited and switched" into

purchasing the policies by Hartford Salesperson Richard Harper ("Harper").

(Doc. 1 ¶ 5, 17.)  Plaintiffs' relationship with Harper arose in May of 2000, when

plaintiffs were introduced to Harper by Charles R. Eberly, Jr. ("Eberly"), a financial

advisor for Wachovia Securities ("Wachovia") who manages the DC Plan portfolio

for plaintiffs.  (Id. ¶¶ 19-20, 22.)  Eberly explained to plaintiffs that Harper was an

estate and tax expert who offered his services to financial advisors at Wachovia as

---

[2]  A nonqualified deferred compensation plan is "any elective or nonelective plan, agreement, method, or arrangement between an employer and an employee . . . to pay the employee compensation some time in the future."  Internal Revenue Service, Nonqualified Deferred Compensation Audit Techniques Guide, http://www.irs.gov/businesses/corporations/article/0,,id=134878,00.html (last visited May 16, 2007).

[3]  CIESCO, Inc. is a related company to Novinger Group.  (Doc. 1 ¶ 8.)  Kruse is the President of CIESCO, Inc.  (Id.)

part of a pilot program to generate additional fees for investment accounts.  (<u>Id.</u> ¶ 23.)  In addition, both Hartford and Wachovia touted Harper as an estate and tax expert who would represent plaintiffs' interests.  (<u>Id.</u> ¶¶ 17, 26.)

Plaintiffs paint a much different picture of Harper, alleging that his sole objective was to sell insurance and not to provide expert estate or tax advice.  (<u>Id.</u> ¶ 25.)  Neither Wachovia nor Hartford revealed to plaintiffs that Harper's compensation was directly linked to his sales of Hartford products or that Eberly and Harper had a fee-sharing relationship.  (<u>Id.</u> ¶¶ 24, 29, 32-33.)

### 1.   <u>The December Sale</u>

In August of 2001, Eberly arranged for James, Hospodavis, and Kruse to meet with Harper to discuss business succession.  (<u>Id.</u> ¶ 37.)  Harper presented plaintiffs with composite illustrations of several insurance policies that could be purchased by the DC Plan as an aid to business succession.[4]  (<u>Id.</u> ¶ 38.)  One such policy was Hartford's  Variable Universal Life Policy (hereinafter "VUL Policy").  The VUL Policy's illustration suggested that the DC Plan would be required to pay an initial premium of $149,000 to purchase the policy for all plan participants.  (<u>Id.</u> ¶¶ 39-40.)  A second option presented by Harper was a Pacific Life Policy.  (<u>Id.</u> ¶ 42; <u>Id.</u>, Ex. B.)  However, plaintiffs allege that Harper never fully explained the Pacific Life Policy and presented the VUL Policy as the "superior" option because his goal

---

[4]  Plaintiffs allege that during the course of their business relationship with Harper and Hartford, they presented only variable life insurance options to the exclusion of all other business succession solutions.  (Doc. 1 ¶ 51.)

was to take advantage of the fee-sharing relationship between Hartford and

Wachovia.  (Id. ¶¶ 27, 42-43.)  The VUL Policies were not presented as insurance,

but as short-term tax free investments that could be withdrawn at any time without

incurring surrender charges.[5]  (Id. ¶¶ 52-53; Id., Ex. H.)

In September of 2001, Harper presented plaintiffs with a second set of

illustrations, which again stated that the initial premium for the VUL Policies would

be $149,000.  (Id. ¶¶ 39, 45, 48; Id., Ex. G.)  Harper met with plaintiffs again in

October and November of 2001, during which time he maintained that the initial

premiums would be $149,000.  (Id. ¶ 50.)  On December 4, 2001, a Hartford Senior

Account Executive met with Harper and presented revised initial premium figures.

(Id. ¶ 55.)  As a result, the initial premium estimate was increased from $149,000 to

$635,200.  (Id. ¶ 56, 59.)

On December 5, 2001, Hartford presented a third and final set of illustrations

to plaintiffs.  (Id. ¶ 54, 63; Id., Ex. I.)  Plaintiffs chose to purchase the VUL Policies

during the December 5 meeting.  (Id. ¶ 60.)  Although plaintiffs signed the third set

of illustrations acknowledging that they had read and understood the VUL Policies,

plaintiffs claim that they were "duped" in the execution of the policies.  (Id. ¶¶ 78-

79.)  Plaintiffs explain that they were rushed into signing the policies and did not

---

[5] Hartford denies this allegation and states that the plans were presented as insurance policies.  (Doc. 17 at 14.)

fully understand them.[6]  (Id. ¶¶ 74, 87-88.)  Plaintiffs allege that they were not made

aware of the premium increase during the December 5 meeting and that Hartford

amended the third set of illustrations to reflect the premium increase *after* the

meeting.  (Id. ¶¶ 54, 56, 63.)  Plaintiffs also allege that they were provided with an

"egregious and unnecessary" amount of insurance that differed from the amount

that had been promised in previous illustrations.  (Id. ¶¶ 18, 56-57.)

Harper executed plaintiffs' insurance applications during the December 5

meeting.  (Id. ¶ 60.)  The applications certified that Harper:  (1) asked each

application question separately and recorded the answers as given, (2) gave the

"Proposed Insured(s) the appropriate Disclosure documents," and (3) "reviewed the

purchase of this insurance policy as to suitability."  (Id.)  Plaintiffs allege that

Harper did not fulfill these requirements and that they were "misled, misinformed,

and confused at the time of the December Sale and execution of the Application."

(Id. ¶ 61.)  Specifically, plaintiffs allege that Harper failed to:  (1) explain the VUL

Policies or the final premium figures in simple non-technical terms, (2) meet with

the plan participants individually to ask them the appropriate application

questions, (3) "perform any due diligence as to whether the Plaintiffs could afford

---

[6]  Plaintiffs alleged misunderstanding of the policies arises partially from the
fact that they were never provided with prospectuses, which reduced their ability
"to make a well informed and reasonable decision" regarding the VUL Policies.
(Doc. 1 ¶¶ 15, 44, 49-50, 82-83.)  Hartford counters that plaintiffs have included in
their exhibits "signed disclosures for each and every insured stating that each
insured did, in fact, receive a prospectus."  (Doc. 17 at 9.)

the VUL Policies," and (4) use "reasonable judgment" when advising the plan participants regarding their investment choices.  (Id. ¶¶ 51, 62-63, 67-69, 79, 85-86.)

The policies were delivered to the plan participants  on January 4, 2002. (Doc. 1 ¶ 81.)  Upon receipt, each plan participant signed a disclosure acknowledgment and a policy delivery receipt.  (Id.)  The disclosure acknowledgments contained initial premium amounts for each plan participant,[7] and stated:

> I have received a copy of this illustration and a prospectus.  I understand that:
> - Any non-guaranteed elements illustrated are subject to change and could either be higher or lower resulting in policy values that will either be higher or lower.
> - The Registered Representative has told me that they are not guaranteed.
> - In the future, I may need to modify my planned premium to obtain any initial death benefit and to obtain the non-guaranteed values shown on this illustration.
> - This illustration demonstrates how the policy works and is not a guarantee of future performance.
> - The policy values will fluctuate depending upon the performance of the actual investment Sub-Accounts I select.
> - Hartford Life and Annuity Insurance Company and/or its representatives do not provide tax or legal advice.

(Doc. 18, Ex. A.)  Nevertheless, plaintiffs allege that they were not provided the opportunity to review the executed applications or the third set of illustrations at that time.  (Doc. 1 ¶ 81.)

_____

[7]  Hartford alleges that these amounts put plaintiffs on notice that the amount of premiums owed had increased to $635,200.  (Doc. 17 at 14.)

## 2.   **The April Sale**

On April 15, 2002, plaintiffs purchased from Hartford a $6,000,000 Buy-Sell

Policy on the life of James.  (Id. ¶¶ 89-91.)  The policy was to be funded via a split-

dollar agreement.[8]  (Id. ¶ 91.)  The agreement, which was created by Harper,

provided that Kruse was to borrow money from Novinger Group to pay the

insurance premiums for five years and then use the death benefit from the Buy-Sell

Policy to purchase shares of Novinger Group from James.  (Id. ¶ 92.)  Kruse would

then repay the loan from Novinger Group with the remainder of the death benefit

from the Buy-Sell Policy.  (Id. ¶¶ 93-94.)

To finance the loan from Novinger Group to Kruse, Hartford advised

plaintiffs to exchange two mature policies from New York Life for the Buy-Sell

Policy.  (Id. ¶¶ 102, 106.)  The New York Life policies were performing well, were

not subject to any surrender charges, and had a combined cash value of $440,372.40.

---

[8] A split-dollar agreement is "any arrangement between an owner and a non-owner of a life insurance contract that satisfies the following criteria - -

> (i)  Either party to the arrangement pays, directly or indirectly, all or any portion of the premiums on the life insurance contract, including a payment by means of a loan to the other party that is secured by the life insurance contract;
> (ii)  At least one of the parties to the arrangement paying premiums . . . is entitled to recover (either conditionally or unconditionally) all or any portion of those premiums and such recovery is to be made from, or is secured by, the proceeds of the life insurance contract; and
> (iii)  The arrangement is not part of a group-term life insurance plan . . . unless the group-term life insurance plan provides permanent benefits to employees."

26 C.F.R. § 1.61-22(b).

(Id. ¶¶ 104-105.)  Plaintiffs aver that the exchange subjected them to surrender charges and commissions that they would not have incurred otherwise and only served the interests of Hartford.  (Id. ¶¶ 106-107.)

Hartford advised plaintiffs that in five years the cash value of the Buy-Sell Policy would be sufficient to permit Kruse "to comfortably withdraw $2,000,000 . . . to fund the purchase of 35% of [James's] stock."  (Id. ¶ 96.)  Hartford also advised plaintiffs that this would leave the Buy-Sell Policy with a cash value of approximately $300,000 "to sustain a residual and permanent death benefit of $2,000,000 to cover the loan owed by Kruse for the monies used to pay the premiums under the Split Dollar Agreement."  (Id. ¶ 97.)

Plaintiffs allege that their decision to purchase the Buy-Sell Policy was based partially on the fact that Hartford "created a false sense of urgency with respect to the insurability of [James]."  (Id. ¶¶ 113-114, 119.)  After securing "uninterested third party experts," plaintiffs concluded that Hartford had made certain misrepresentations in connection with the sale of the policy.  (Id. ¶ 122.)  Plaintiffs allege, *inter alia*, that Hartford:  (1) "engaged in deceptive conduct by presenting the Split Dollar Agreement as a viable business succession option," (2) "selected an investment vehicle . . . that was unsuitable and unable to attain the Plaintiffs' stated goal of accumulating $2.3 million dollars of cash value within five years," and (3) failed to inform them of "the impact of the surrender charges on the withdrawal of the $2,000,000 from the Buy-Sell Policy."  (Id. ¶¶ 98-99, 101, 115-116.)

### C.   **Procedural History**

On January 24, 2006, plaintiffs commenced the instant action, raising claims of:  (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 PA. CONS. STAT. ANN. § 201-1(ii), (4) negligent supervision, (5) violation of Rule 10(b)(5), 17 C.F.R. § 240.10b-5, and (6) violation of Pennsylvania's Insurance Bad Faith Statute, 42 PA. CONS. STAT. ANN. § 8371.  (See Doc. 1.)

On March 28, 2006, Hartford filed the instant motion to dismiss, arguing that: (1) plaintiffs' claims are barred by the statute of limitations, (2) plaintiffs James and Hospodavis lack standing to assert claims pursuant to Rule 10(b)(5) and the UTPCPL, (3) plaintiffs' fraud-based claims are not pled with the requisite level of specificity, and (4) plaintiffs have failed to state any claim upon which relief can be granted.  (See Doc. 16; Doc. 17 at 20-39.)  The motion has been fully briefed and is ripe for disposition.

## II.   **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of claims that fail to assert a basis upon which relief can be granted.  FED. R. CIV. P. 12(b)(6). In the context of a motion to dismiss under Rule 12(b)(6), the court must accept as true all of the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom.  Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000) (citing Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)).  Although the court

9

is generally limited in its review to the face of the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

Federal notice pleading rules do not require plaintiffs to allege affirmatively every aspect of their claims, but only to present sufficient facts to allow the opposing party to conduct discovery and prepare a defense.  See FED. R. CIV. P. 8(a) (stating that the complaint should include "a short and plain statement of the claim showing that the pleader is entitled to relief"); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Thus, courts should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Id.; see Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002).  Under this liberal pleading policy, courts should generally grant plaintiffs leave to amend their claims before dismissing a complaint that is merely deficient.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).

III.   **Discussion**[9]

A.   **Statute of Limitations**

A statute of limitations generally begins to run when a cause of action arises or accrues.  See Cooper v. Sirota, 37 F. App'x 46, 48 (3d Cir. 2002).  In the matter *sub judice*, Hartford argues that the statute of limitations on plaintiffs' claims began to run when plaintiffs received the VUL Policies on January 4, 2002 and the Buy-Sell Policy on April 15, 2002.  (Doc. 1 ¶¶ 81, 90.)  Because plaintiffs' complaint was filed on January 24, 2006, Hartford asks the court to dismiss as time-barred any claims with a two-year or four-year statute of limitations.[10]  Plaintiffs counter that their claims are protected by the discovery rule, which tolls the statute of limitations until a plaintiff "knew or using reasonable diligence should have known" of his or her

_____

[9] Jurisdiction over the instant action is based on diversity of citizenship, see 28 U.S.C. § 1332, and neither party disputes the applicability of Pennsylvania law to plaintiffs' claims, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938).

[10] Specifically, Hartford alleges that plaintiffs' claims of breach of contract, breach of the duty of good faith and fair dealing, negligence, insurance bad faith, and Rule 10(b)(5) violations are time-barred.  In Pennsylvania, claims of breach of contract and breach of the duty of good faith are subject to a four-year statute of limitations.  See 42 PA. CONS. STAT. ANN. § 5525; see also Anserphone, Inc. v. Bell Atl. Corp., 955 F. Supp. 418, 431 (W.D. Pa. 1996) (stating that a claim for breach of the duty of good faith and fair dealing is a "species of a contract claim," which is governed by a four-year statute of limitations).  Claims of negligence and insurance bad faith are subject to a two-year statute of limitations.  See 42 PA. CONS. STAT. ANN. § 5524; Ash v. Cont'l Ins. Co., 861 A.2d 979, 984 (Pa. Super. Ct. 2004) (stating that a claim of insurance bad faith under 42 PA. CONS. STAT. ANN. § 8371 "is a statutorily-created tort action subject to a two-year statute of limitations").  Claims under Rule 10(b)(5) must be commenced within "two years after the discovery of the facts constituting the violation or five years after such violation," whichever occurs first.  28 U.S.C. § 1658(b).

injury.  Vernau v. Vic's Mkt., Inc., 896 F.2d 43, 46 (3d Cir. 1990); see also Bohus v.

Beloff, 950 F.2d 919, 924-25 (3d Cir. 1991).

"A motion to dismiss premised on statute of limitations grounds may only be

granted if it is apparent from the face of the complaint that the cause of action was

not brought within the limitations period."  Schreiber v. Eli Lilly & Co., No. Civ.A.

05CV2616, 2006 WL 782441, at *7 (E.D. Pa. Mar. 27, 2006); see also Benak v. Alliance

Capital Mgmt., 435 F.3d 396, 400 (3d Cir. 2006).  In the instant case, plaintiffs'

complaint does not specifically indicate when plaintiffs discovered their alleged

injuries.  However, the very nature of plaintiffs' claims implies that plaintiffs were

unaware of the alleged policy deficiencies at the time that the policies were

executed.  Plaintiffs allege, *inter alia*, that they signed the policies because they had

been "misled, misinformed, and confused" by Hartford and Harper and that the

policies were executed "in a manner that duped the Plaintiffs."  (Doc. 1 ¶¶ 61, 78.)

Plaintiffs further allege that they did not learn of Hartford's misrepresentations

until they secured "uninterested third party experts."  (Id. ¶ 122.)  While the

allegations of plaintiffs' complaint demonstrate the potential applicability of the

discovery rule, the exact time when plaintiffs discovered or should have discovered

their alleged injuries remains unclear.[11]  Accordingly, plaintiffs' allegations are

sufficient to survive a motion to dismiss, and the court must deny Hartford's motion

with respect to its statute of limitations argument.[12]

### B.   Failure to State a Claim

Hartford alleges that plaintiffs have failed to state valid claims of UTPCPL

violations, breach of contract, breach of the duty of good faith and fair dealing, Rule

10b-5 violations, and insurance bad faith.  The court will address these claims

*seriatim.*

### 1.   UTPCPL

The UTPCPL is designed to protect the public from fraud and deceptive

business practices.  See Pirozzi v. Penske Olds-Cadillac-GMC, Inc., 605 A.2d 373

---

[11]  In their brief in opposition to Hartford's motion to dismiss, plaintiffs indicate that they "were completely unaware anything was problematic until [they] received [their] first statements on the [VUL] Policies in March of 2002." (Doc. 23 at 12.)  Plaintiffs also indicate that "it was not until much later, and after speaking to other experts and counsel, when Plaintiffs began to become aware of the unsuitability of the Policies and the Defendant's breach." (Id. at 12-13.)  However, the court may not consider these facts in the context of a motion to dismiss because the facts are not included on "the face of the complaint." Benak, 435 F.3d at 400.

[12] Hartford asserts that the discovery rule does not protect plaintiffs' claims because plaintiffs' decision not to review the policies upon receipt constituted a failure to use reasonable diligence. (Doc. 17 at 25; Doc. 24 at 6-7.)  This argument is better suited for summary judgment.  See Cooper, 37 F. App'x at 49 (granting summary judgment in favor of the defendant because the plaintiff's decision not to read her insurance policy constituted "a failure to use reasonable diligence"); McKenna v. Metro. Life Ins. Co., 126 F. App'x 571, 575-76 (3d Cir. 2005) (same); see also Schreiber, 2006 WL 782441, at *7 n.13 (concluding that while plaintiffs should not "be rewarded for providing only minimal information about the timing of their discovery" of a defendant's actions, application of the discovery rule is better suited for resolution at summary judgment).

(Pa. Super. Ct. 1992); <u>Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.</u>, 574 A.2d 641, 644 (Pa. Super. Ct. 1990).  To achieve that purpose, the UTPCPL provides a private right of action for "any person who purchases . . . goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property" because the seller engaged in "unfair or deceptive acts or practices."  73 PA. CONS. STAT. ANN. §§ 201-3, 201-9.2(a). Whether a purchase is for personal, family or household purposes depends on the "*purpose* of the purchase, not the *type of product* purchased."  <u>Valley Forge</u>, 574 A.2d at 648 (emphasis in original).[13]

In the action *sub judice*, Hartford alleges that plaintiffs lack standing under the UTPCPL because they purchased the policies for business, rather than "personal, family or household purposes."  (Doc. 17 at 30; Doc. 24 at 8-9); <u>Britamco Underwriters, Inc. v. C.J.H., Inc.</u>, 845 F. Supp. 1090, 1096 (E.D. Pa. 1994) ("Where

---

[13] <u>Valley Forge</u> sets forth an instructive example concerning the distinction between personal, family or household purposes:

> If a laundry business were to purchase a home-use model, department store dryer for the primary purpose of drying clothes for the laundry business, such a purchase would be primarily for a *business* purpose, despite the fact that the dryer may have been a typical "consumer product."  On the other hand, if the parents of twelve growing children purchased an industrial washer and dryer from a business supplier to be used primarily to do the family's laundry, the purchase would be primarily for a family purpose and come within the ambit of 73 PA. CONS. STAT. ANN. § 201-9.2, notwithstanding the fact that industrial washers and dryers generally might not be considered typical "consumer products."

574 A.2d at 648 (emphasis in original).

insurance is purchased for business purposes, there will be no standing to assert a private cause of action [under the UTPCPL].").  In the instant case, plaintiffs admit that they purchased the policies for purposes of business succession.  (Doc. 23 at 28.)  The court finds that this is clearly a business purpose and that plaintiffs have failed to allege otherwise in their complaint.  (See Doc. 1 ¶¶ 130-146.)  Accordingly, plaintiffs lack standing to assert a cause of action under the UTPCPL, and Hartford's motion to dismiss this claim will be granted.  See W. Coast Franchising Co. v. WCV Corp., 30 F. Supp. 2d 498, 500 (E.D. Pa. 1998) (dismissing UTPCPL claims where plaintiff failed to allege that the products were purchased for "personal, family or household purposes"); Britamco, 845 F. Supp. at 1096 (holding that company lacked standing under the UTPCPL where it purchased a "multi-peril insurance policy" that covered its business premises).

## 2.   **Breach of Contract**

To establish a valid claim for breach of contract in Pennsylvania, a plaintiff must plead:  "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  JML Indus., Inc. v. Pretium Packing, LLC, Civ. A. No. 3:04-CV-2552, 2007 WL 61061, at *2 n. 3 (M.D. Pa. Jan. 5, 2007) (citing Omicron Sys. Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)).  In the instant case, Hartford argues that plaintiffs have failed to establish a breach of any of the provisions of the VUL or Buy-Sell Policies.  (Doc. 17 at 31.)  The court agrees that plaintiffs have failed to allege a breach of any of the explicit policy provisions.  (See Doc. 1 ¶¶ 124-126.)

15

However, plaintiffs assert that "the inducements, the misrepresentations, and the omissions fostered by" Hartford in the sale of the VUL and Buy-Sell Policies are actionable as a breach of contract.  (Doc. 23 at 21-23.)  In essence, plaintiffs ask the court to find that the alleged misrepresentations made by Hartford became binding terms of the VUL and Buy-Sell Policies and that those terms were ultimately breached by Hartford.  Plaintiffs' argument implicates the parol evidence rule, which states that where the parties have adopted a writing "as the final and complete expression of their agreement, . . . evidence of negotiations leading to the formation of the agreement is inadmissible" to explain or contradict the language of the written agreement.  1726 Cherry St. P'ship v. Bell Atl. Props., Inc., 653 A.2d 663, 665 (Pa. Super. Ct. 1995).  One exception to this exclusionary rule is that parol evidence may be introduced where a party alleges fraud in the execution, i.e., "that a term was omitted from the contract because of fraud, accident, or mistake." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 437 (Pa. 2004).  However, "parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, i.e., that an opposing party made false representations that induced the complaining party to agree to the contract."  Id. at 437 n.26.

In the instant case, the court finds that the VUL and Buy-Sell Policies represent a "final and complete expression" of the agreement between plaintiffs and Hartford.  (See, e.g., Doc. 18, Ex. B at 31 ("The Policy, the attached copy of the initial application, any applications for reinstatement, all subsequent applications to change the Policy, any endorsements or riders and all additional policy information

16

sections added to the Policy are the entire contract.")); see also Yocca, 854 A.2d at

436 (stating that a "clause which states that a writing is meant to represent the

parties' entire agreement is . . . a clear sign that the writing is meant to be just

that'). However, plaintiffs' complaint clearly alleges that Hartford committed fraud,

and the court is unable to ascertain from the pleadings alone whether the

allegations are best characterized as fraud in the execution or fraud in the

inducement. Accordingly, the court cannot determine, on the basis of the present

record, whether parol evidence should be permitted to add supplementary terms to

the VUL and Buy-Sell Policies, and the motion to dismiss plaintiffs' breach of

contract will be denied.

### 3.      Breach of the Duty of Good Faith and Fair Dealing

"Every contract imposes on each party a duty of good faith and fair dealing in

its performance and its enforcement." Kaplan v. Cablevision of Pa., 671 A.2d 716,

721-22 (Pa. Super. Ct. 1996) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205)

(emphasis added). However, the duty of good faith and fair dealing does not extend

to issues of contract formation. Falbo v. State Farm Life Ins. Co., No. 96-5540, 1997

WL 116988, *7 (E.D. Pa. Mar. 13, 1997) ("The duty is one relating to performance of

a contract, not formation"); see also RESTATEMENT (SECOND) OF CONTRACTS § 205

cmt. c (stating that certain issues of bad faith in contract formation "are subject to

rules as to capacity to contract, mutual assent and consideration and of rules as to

invalidating causes such as fraud and duress"). In the instant case, plaintiffs allege

that Hartford breached the duty of good faith in thirteen separate ways, all of which

relate to Hartford's actions prior to contract formation.  (See Doc. 1 ¶¶ 129(i)-(xiii).)

Accordingly, plaintiffs cannot maintain a claim for breach of the duty of good faith

and fair dealing, and the motion to dismiss this claim will be granted.

### 4.   **Rule 10b-5**

Rule 10(b)(5) makes it unlawful for any person to "make any untrue

statement of a material fact or to omit to state a material fact necessary in order to

make the statements made, in the light of the circumstances under which they were

made, not misleading . . . in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b-5.  To state a viable claim of securities fraud pursuant to Rule

10b-5, a plaintiff is required to plead:  (1) a material misrepresentation or omission;

(2) made with a wrongful state of mind; (3) in connection with the purchase or sale

of a security; (4) reliance; (5) economic loss; and (6) loss causation.[14]  In re Suprema

---

[14] These heightened pleading requirements are derived from the Federal
Rule of Civil Procedure 9(b), which states: "In all averments of fraud or mistake, the
circumstances constituting fraud or mistake shall be stated with particularity," and
the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  The
PSLRA provides, in pertinent part, as follows:

> In any private action arising under this chapter in which the plaintiff alleges
> that the defendant --
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements
> made, in the light of the circumstances in which they were made, not
> misleading;
>
> the complaint shall specify each statement alleged to have been misleading,
> the reason or reasons why the statement is misleading, and, if an allegation
> regarding the statement or omission is made on information and belief, the
> complaint shall state with particularity all facts on which that belief is
> formed.

Specialities, Inc. Secs. Litig., 438 F.3d 256, 275 (3d Cir. 2006); see also In re

Rockefeller Ctr. Props, Inc. Secs. Litig., 311 F.3d 198, 216 (3d Cir. 2002).  In other

words, a plaintiff is required to support his or her allegations of securities fraud

with "all of the essential factual background that would accompany 'the first

paragraph of any newspaper story' - that is, the 'who, what, when, where and how'

of the events at issue."  Id. at 217 (quoting Burlington, 114 F.3d at 1422).

        In the instant case, Hartford argues that plaintiffs' Rule 10b-5 claim must be

dismissed because plaintiffs have failed to allege that Hartford made

misrepresentations or omissions that led to the purchase of the policies.  (Doc. 17 at

33.)  The court finds that the complaint contains numerous allegations of

misrepresentations and omissions by Hartford.  The four paragraphs setting forth

plaintiffs' Rule 10b-5 claim alone contain at least nine allegations of omissions and

two allegations of false representations made by Hartford.  (See Doc. 1 ¶¶ 150-153.)

While Hartford argues that these representations and omissions are more properly

attributable to Harper, this argument presents an issue of fact that cannot be

resolved in the restricted posture of a motion to dismiss.

        Next, Hartford argues that plaintiffs have failed to satisfy the second element

of a Rule 10b-5 claim, i.e., that the defendant's behavior was knowing or reckless.

See In re Advanta Corp. Secs. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999).  In the Rule

10b-5 context, a defendant's behavior is considered reckless if it involves "an

extreme departure from the standards of ordinary care, and [] presents a danger of

---

15 U.S.C. § 78u-4(b)(1).

misleading buyers or sellers that is either known to the defendant or is so obvious that the [defendant] must have been aware of it."  GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004).  Viewing the complaint in the light most favorable to plaintiffs, the court finds sufficient allegations that Hartford acted recklessly.  For example, plaintiffs repeatedly allege that Hartford failed to provide them with vital policy information, including composite illustrations, prospectuses, and sub-account investment advice.  (Doc. 1 ¶¶ 153(i), (ii), (vii)).  Furthermore, plaintiffs allege that Hartford misled them into believing that Harper was a neutral expert whose compensation did not depend upon his sale of Hartford products.  (Id. ¶¶ 153 (iii), (x)-(xii)).  Considered in combination, Hartford's alleged actions could constitute an extreme departure from the standard of care owed by an insurance company to its policyholders.

Next, Hartford argues that plaintiffs have failed to satisfy the sixth element of a Rule 10b-5 claim, i.e., loss causation.  To establish loss causation, a plaintiff must demonstrate a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  In re Intelligroup Secs. Litig., 468 F. Supp. 2d 670, 681 (D.N.J. 2006); see also Suprema, 438 F.3d at 275; 15 U.S.C. § 78u-4(b)(4).  In the instant case, plaintiffs' complaint alleges, inter alia, that Hartford's misrepresentations caused plaintiffs to  incur higher premiums and associated fees than originally estimated and to receive lower returns than promised.  (See, e.g., Doc. 1 ¶¶ 18, 59, 101, 108.)  The court finds these allegations sufficient to meet the loss causation element at this stage.

Finally, Hartford argues that plaintiffs James and Hospodavis lack standing to assert a Rule 10b-5 claim for money damages because they are neither purchasers nor sellers of securities.  The United States Supreme Court has held that "only a purchaser or seller of a security has standing to bring a private 10b-5 securities fraud action for money damages."  Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 485 (3d Cir. 1998).  The complaint in the instant case alleges that Hartford sold the VUL and Buy-Sell Policies to Novinger Group and not to the individual plaintiffs.  (See Doc. 1 ¶ 7; see also id. at 22 ("Novinger Group bought the Buy-Sell Policy.")).  Because James and Hospodavis are not purchasers of securities, they lack standing to assert a Rule 10b-5 action for damages.

Case 1:06-cv-00188-CCC   Document 31   Filed 05/16/07   Page 22 of 25

For the foregoing reasons, the court will deny the motion to dismiss with

respect to the Rule 10b-5 claims of Novinger Group, but will grant the motion with

respect to the Rule 10b-5 claims asserted by James and Hospodavis.[15]

**5.   Insurance Bad Faith**

Section 8371 of Title 42 of the Pennsylvania Consolidated Statutes creates a

statutory remedy for bad faith in the handling of insurance policies.  See Nelson v.

State Farm Mut. Auto Ins. Co., 988 F. Supp. 527, 532 (E.D. Pa. Dec. 12, 1997).  The

statute provides as follows:

---

[15]  The court notes with interest that Congress has exempted certain
insurance policies from the definition of "securities" set forth in 15 U.S.C.
§ 78c(a)(10).  See 15 U.S.C. § 11c(a)(8) (exempting any "insurance . . . contract . . .
issued by a corporation subject to the supervision of the insurance commissioner . .
. of any State or Territory of the United States" from the definition of a security);
see also Glah v. Mass. Mut. Life Ins. Co., No. Civ.A. 03-2407, 2003 WL 22872037, at *4
(E.D. Pa. 2003).  Securities and Exchange Commission Rule 151 further refines the
insurance contract exemption.  See 17 C.F.R. § 230.151.  That rule states that an
insurance contract is not to be considered a security if: (1) it is issued by an insurer
subject to supervision of the applicable state insurance department, (2) the insurer
assumes the investment risk under the contract, and (3) the contract is "not
marketed primarily as an investment."  Id.; see also Berent v. Kemper Corp., 780 F.
Supp. 431, 441 (E.D. Mich. 1991).
    In the instant motion to dismiss, Hartford has not addressed the issue of
whether the VUL and Buy-Sell Policies qualify as securities for purposes of Rule
10b-5.  Because plaintiffs contend that the policies were marketed primarily as an
investment, some question remains as to whether the insurance exemption set forth
above applies.  This issue is more appropriately resolved in the context of a motion
for summary judgment.

22

> In an action arising under an insurance policy, if the court finds that the insurer acted in bad faith toward the insured, the court may take all of the following actions:
>> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>> (2) Award punitive damages against the insurer.
>> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. ANN. § 8371.  Pennsylvania's bad faith statute offers no definition of "bad faith toward the insured."  Condio v. Erie Ins. Exch., 899 A.2d 1136, 1156 (Pa. Super. Ct. 2006).  However, the Pennsylvania Superior Court and the Third Circuit Court of Appeals have repeatedly held that "the essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits."  UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 506 (3d Cir. 2004); see also Cresswell v. Pa. Nat'l Mut. Cas. Inx. Co., 820 A.2d 172, 180 (Pa. Super. Ct. 2003) ("[A] 'bad faith' claim must demonstrate by clear and convincing evidence that: (1) insurer lacked a reasonable basis for denying benefits; and (2) insurer knew or recklessly disregarded its lack of a reasonable basis."); O'Donnell v. Allstate Ins. Co., 734 A.2d 901 (Pa. Super. Ct. 1999) ("'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy.").

In the instant case, plaintiffs' allegations of bad faith relate to alleged misrepresentations and omissions that occurred prior to formation of the insurance contracts.  (See Doc. 1 ¶¶ 155-169.)  Because plaintiffs have not alleged that Hartford denied them benefits under the policy, plaintiffs have failed to state a claim for insurance bad faith under 42 PA. CONS. STAT. ANN. § 8371.  Accordingly, Hartford's motion to dismiss will be granted with respect to this claim.

**IV.**   **Conclusion**

For the reasons set forth above, Hartford's motion to dismiss will be granted with respect to plaintiffs' claims of UTPCPL violations, breach of the duty of good faith and fair dealing, and insurance bad faith pursuant to 42 PA. CONS. STAT. ANN. § 8371.  The motion to dismiss will also be granted with respect to the claims of plaintiffs James and Hospodavis pursuant to Rule 10b-5.  The motion to dismiss will be otherwise denied.  An appropriate order will issue.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      May 16, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NOVINGER GROUP, INC., et al.,** | : | **CIVIL ACTION NO. 1:06-CV-0188** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **HARTFORD INSURANCE, INC.,** | : | |
| | : | |
| **Defendant** | : | |

**ORDER**

AND NOW, this 16th day of May, 2007, upon consideration of defendant's

motion to dismiss (Doc. 16), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that the motion to dismiss (Doc. 16) is

GRANTED in part and DENIED in part as follows:

1. Plaintiffs' claims of Unfair Trade Practices and Consumer Protection Law violations, breach of the duty of good faith and fair dealing, and insurance bad faith pursuant to 42 PA. CONS. STAT. ANN. § 8371 are DISMISSED. The claims of plaintiffs James David Novinger and Patrick D. Hospodavis pursuant to Rule 10b-5 are also DISMISSED.

2. The motion to dismiss (Doc. 16) is otherwise DENIED.

3. Leave to amend is DENIED as futile. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

       S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge