**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NOVINGER GROUP, INC., JAMES DAVID NOVINGER, and PATRICK D. HOSPODAVIS,** | : | **CIVIL ACTION NO. 1:06-CV-0188** |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| **v.** | : | |
| **HARTFORD LIFE & ANNUITY INSURANCE COMPANY,** | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

This is a diversity action sounding in negligence, securities fraud, and breach of contract, filed by plaintiffs the Novinger Group, Inc., James David Novinger, and Patrick D. Hospodavis (collectively "plaintiffs"). Plaintiffs contend that defendant Hartford Life and Annuity Insurance Company[1] ("Hartford") breached the terms of several life insurance policies and failed to fulfill its duty to supervise an agent licensed to sell such policies. Additionally, the Novinger Group, Inc. ("Novinger Group") alleges that Hartford violated Rule 10b-5 of the federal securities law, <u>see</u> 17 C.F.R. § 240.10b-5. Presently before the court is Hartford's motion for summary judgment on all claims. (Doc. 59.) For the reasons that follow, the motion will be granted.

---

[1] The caption of the complaint in the instant case incorrectly refers to defendant Hartford Life and Annuity Insurance Company as "Hartford Insurance Inc." (Doc. 1.) The proper nomenclature is used throughout this memorandum, (<u>see</u> Doc. 60 at 1.).

## I.   <u>Statement of Facts</u>[2]

Novinger Group is a privately held Pennsylvania corporation, with an employment roll of over 350 and an annual revenue in excess of $60 million.  (<u>See</u> Doc. 1 ¶ 1; Doc. 61, Ex. B at 12; Doc. 63 ¶ 2.)  Plaintiff James David Novinger ("James") owns a predominant share of the company and is the acting president and chief executive officer.  (Doc. 61, Ex. B at 11-12.)  Plaintiff Patrick Hospodavis ("Hospodavis") is Novinger Group's chief financial officer.  (Doc. 61, Ex. A at 11.) Hartford is an insurance company organized under the laws of Connecticut.  (Doc. 63 ¶ 3.)  Plaintiffs' claims are premised upon alleged wrongdoing committed by Hartford's agent, Richard Harper ("Harper"), who is not a party to this action.  (<u>See</u> Doc. 61, Ex. B at 97-98, 101, 106; Ex. D at 109-10; Doc. 71, Ex. C at 130.)

---

[2] In accordance with the standard of review for a motion for summary judgment, the court will present the disputed facts in the light most favorable to the plaintiffs, who are the non-moving party.  <u>See</u> <u>infra</u> Part II.  However, the majority of the facts in the instant matter are undisputed.  Rule 56.1 requires the non-moving party's statement of facts to respond to the numbered paragraphs set forth in the moving party's statement.  L.R. 56.1.  Moreover, a responsive statement "shall include references to the parts of the record that support the statements."  <u>Id.</u> Plaintiffs' statement of facts does not respond to Hartford's statement and is replete with unsupported factual assertions.  (<u>Compare</u> Doc. 63 (Hartford's statement of facts), <u>with</u> Doc. 73 (plaintiffs' statement of facts)).  Therefore, with the exception of those facts clearly disputed by plaintiff and supported by adequate record references, the court will adopt Hartford's statement of facts.  <u>See</u> L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); <u>see also</u> <u>United States ex rel. Paranich v. Sorgnard</u>, 286 F. Supp. 2d 445, 447 n.3 (M.D. Pa. 2003) (adopting moving party's statement of facts when non-movant failed to comply with Local Rule 56.1), <u>aff'd</u>, 396 F.3d 326, 330 & n.5 (3d Cir. 2005).

### A.   <u>The December 2001 Sale</u>

The dispute in this case primarily centers upon the sale of eight variable life insurance policies[3] by Hartford to Novinger Group in December 2001.  Four months prior to this sale, in August 2001, top executives at Novinger Group were approached by Harper, a Wachovia Securities ("Wachovia") employee licensed to sell Hartford insurance policies through Wachovia.  (Doc. 63 ¶ 6; Doc. 73 at 1.) Plaintiffs expressed interest to Harper in purchasing long-term investment plans for Novinger Group's top executives.  (<u>See</u> Doc. 63 ¶¶ 6-7.)  Harper offered to structure a set of lucrative deferred compensation policies[4] based upon the purchase and retention of variable life insurance through Hartford.  (Doc. 63 ¶ 8; Doc. 73 at 1.)  Essentially, Harper proposed an investment vehicle that required each Novinger Group executive to invest in a life insurance policy containing several sub-accounts, each of which were composed of market-centric mutual funds.  (<u>Id.</u>)

---

[3] A variable life insurance policy provides a vehicle by which a policyholder may divert a portion of his or her premium into a separate investment account, "allowing the policyholder to obtain risk based returns.  The amount of the cash value and death benefit varies with the performance of the underlying assets."  In this way, variable life insurance policies entail both higher risk and greater potential returns.  <u>See</u> Stephen D. Chu, <u>Job Well Done: Preventing the Use of Private Placement Life Insurance to Wrap Hedge Fund Investments</u>, 2008 COLUM. BUS. L. REV. 694, 698 n.16 (2008).

[4] A deferred compensation policy allows participants to defer a portion of their income, which the company matches and sets aside for retirement.  (Doc. 63 ¶ 4.)

Harper met with the plaintiffs again on September 11, 2001, in order to describe the proposed insurance policies in more detail. (See Doc. 61, Ex. A at 31-32; Ex. C ¶¶ 13-14, 16; Doc. 72, Ex. P at 28-32; Doc. 73, Ex. B.) By way of a series of Powerpoint illustrations, Harper outlined the mechanics of the policies. (See Doc. 73, Ex. B.) Harper explained that each Novinger Group policyholder would be required to purchase variable life insurance through Hartford, (see Doc. 61, Ex. A at 37; Ex. D at 23; Doc. 63 ¶ 8), and that the ultimate value of an individual's policy was subject to the performance of the various stock investments comprising the policy's sub-accounts. (Doc. 63 ¶ 8.)

Between September 11, 2001, and December 5, 2001, James, Hospodavis, and Frank Kruse ("Kruse"), another high-ranking Novinger Group executive, participated in at least three more meetings with Harper, each time discussing the specifics of the proposed DC policies. (See Doc. 61, Ex B at 42; Ex. C ¶¶ 17, 20; Doc. 63 ¶ 7.) At some of these meetings, Harper presented illustrations depicting projected financial growth based upon variable rates of market return. (See Doc. 61, Ex. B at 54, 99, 112-13; Doc. 63 ¶ 8; Doc. 71, Ex. C at 139.) Prior to their purchase of the Hartford plans in early December, plaintiffs understood that the ultimate value of the policies was market-based and thus not guaranteed. (Doc. 61, Ex. A at 54; Ex. D at 29; Doc. 63 ¶ 8.)

From December 5 through December 20, 2001, plaintiffs purchased and signed the paperwork for eight Hartford variable life insurance policies. (See Doc. 63 ¶¶ 9-10; Doc. 71, Exs. I-N.) All of the policies were prepared and signed by

Harper.  (See Doc. 71, Exs. I-N.)  By signing each policy, Harper certified that he provided prospectuses and certain financial growth illustrations to the individual policyholder; that he explained that certain policy elements were not guaranteed; and that he had made no statements inconsistent with the financial growth illustrations that he attested to providing.  (See, e.g., id. at Ex. I, p. 8.) Correspondingly, each policyholder acknowledged that his policy's non-guaranteed elements were subject to market fluctuation, that the market projections illustrated in the policy documents did not represent a guarantee of future growth, and that the ultimate value of the variable life insurance policy was dependent upon the market success of its specific sub-accounts.  (Doc. 63 ¶ 14.)

In early January 2002, plaintiffs received executed copies of their Hartford variable life insurance policies.  (Doc. 61, Ex. H; Doc. 63 ¶ 21.)  It is undisputed that the finalized policy documents delivered by Hartford accurately lists all charges and fees, as well as the annual premiums that each policyholder is required to pay. (See Doc. 63 ¶¶ 22-23.)  Furthermore, plaintiffs admit that they did not review the policies at the time of delivery, nor did they do so during the ten-day post-delivery "grace period"[5] provided in the contracts.  (Id. ¶¶ 23, 25.)

---

[5] During the "grace period," the policyholder has a window of opportunity within which to rescind the policy.  (Doc. 63 ¶ 23.)

B.      **The April 2002 Sale**

On April 15, 2002, Hartford sold plaintiffs a $6,000,000 Buy-Sell Policy[6] on the life of James.  (Doc. 63 ¶ 37; Doc. 71, Ex. H.)  This sale was the product of several months of discussion, beginning in October 2001, between Harper, James, Kruse, and Novinger Group's attorneys.  (Doc. 63 ¶¶ 31-32.)  James initially approached Harper because he was seeking to develop an investment vehicle that would enable him to sell his ownership share in Novinger Group to Kruse, who James had selected to succeed him as company president.  (See Doc. 61, Ex. B at 71; Ex. C ¶ 25; Ex. D at 78-80.)  In order to purchase James's shares, Kruse needed to raise $2 million in approximately five years' time.  (See Doc. 61, Ex. D at 79.)  Under the terms of the agreement propounded by Harper, Novinger Group would purchase a Hartford variable life insurance policy—composed of potentially high-return market-based sub-accounts—on the life of James.  (See Doc. 63 ¶ 34-36, 38.)  In advance of the final sale in April 2002, Harper provided plaintiffs with a hypothetical illustration of financial growth based upon variable rates of return, (see id. ¶ 35), and indicated that Kruse could potentially withdraw $2 million from the account in five years, (see Doc. 61, Ex. D at 78-79; Doc. 63 ¶ 35).  Plaintiffs admit

_____

[6] A buy-sell agreement is a contract through which a corporate actor offers to sell his or her equity interest either to the company or to another equity holder in the event of certain occurrences, such as death or retirement.  See James M. Delaney, Estate Taxation of Redemption Agreements: The Treasury Loses "Control", 84 DENV. U. L. REV. 491, 495-96 (2006).

that prior to purchasing the policy, they understood that its value would vary based on the value of its sub-accounts.  (Doc. 63 ¶ 35.)

The Buy-Sell Policy was finalized and signed on April 25, 2002.  (Id. ¶ 44).  It is undisputed that the costs and charges reflected in the executed policy were consistent with the April illustration presented by Harper prior to finalization.  (Id. ¶¶ 42, 45.)  Moreover, plaintiffs concede that they did not examine the policy at the time it was signed, nor did they do so within the twenty days in which a signatory had a right to rescind.  (Id. ¶¶ 41, 47.)

## C.    **The March 2003 Arbitration**

By the fall of 2002, plaintiffs had become concerned about the financial performance of the Hartford policies.  (Id. ¶ 50.)  On November 1, 2002, after speaking with an outside insurance expert, Hospodavis sent a letter to Harper requesting an explanation of the variable life insurance policies' historic rate of return.  (Doc. 71, Ex. C at 118-20.)  Shortly thereafter, plaintiffs' counsel, Neil Yahn ("Yahn"), telephoned Harper to complain about both the variable life policies and the Buy-Sell Policy.  (Doc. ¶ 51.)  Before their conversation ended, Yahn threatened to "bury" Harper in litigation.  (Id.; see also Doc. 61, Ex. C ¶ 30.)

At an impasse with Harper, plaintiffs took their concerns to Wachovia.  In January 2003, Yahn sent Wachovia a letter claiming that Harper engaged in unethical and high-pressure sales tactics in order to force the purchase of the Hartford policies upon Novinger Group.  (See Doc. 62, Ex. S.)  Wachovia denied that Harper engaged in any misconduct.  (Id.)  Plaintiffs responded to Wachovia's self-

7

absolvatory response by announcing their intention to commence civil suit in

Pennsylvania state court.  (See id.)  The tenor of communications between the

parties did not subsequently improve.

On March 13, 2003, plaintiffs initiated arbitration proceedings with the

National Association of Broker Dealers ("NASD") against Wachovia, Harper, and

Hartford.  (Doc. 62, Ex. U.)  Plaintiffs' statement of claim alleged that Harper

"engaged in deceptive sales techniques using misleading materials and illustrations

in the sale of several Hartford Variable Universal Life Insurance Policies."  (Id. at

1.)  Specifically, five grounds for relief were identified: (1) breach of a duty of good

faith; (2) breach of a duty of care of suitability; (3) breach of a duty to supervise; (4)

state law insurance fraud; and (5) violations of Rule 10b-5 of the federal securities

law.  (Id. at 6-11.)  By virtue of a general account agreement, plaintiffs were

contractually required to seek redress with Wachovia and Harper via arbitration.

(See Doc. 62, Ex. S.)  Hartford, who was not a party to the general account

agreement, opted out of the arbitration on August 20, 2003.  (Doc. 62, Ex. T.)

Plaintiffs, Wachovia, and Harper thereafter proceeded to arbitration.  Each of

the parties were represented by counsel, and both Wachovia and Harper were

permitted to submit pre-hearing pleadings answering the allegations contained in

plaintiffs' statement of claim.  (See Doc. 62, Ex. W.)  Additionally, the parties

appeared extensively in hearings before the arbitrators.  Over the course of eight

days in June 2005 and May 2006, seventeen sessions were held before the

arbitration panel in Philadelphia, during which evidence and argument were

presented.[7]  (Id. at 4.)  Harper alone testified for upwards of twelve hours.  (See Doc. 61, Ex. C ¶ 32.)  On May 9, 2006, the arbitration panel issued a written award, holding Wachovia liable for the sum of $70,000, but denying all plaintiffs' claims against Harper.  (Doc. 62, Ex. W at 3; see also Doc. 63 ¶ 55.)  The arbitration award was neither appealed nor submitted to a court for judicial confirmation.

### D.   **Procedural History**

On January 24, 2006, plaintiffs commenced this action, alleging (1) breach of implied and express warranties to sell a suitable product, (2) breach of the duty of good faith, (3) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. ANN. § 201-1(ii), (4) negligent supervision, (5) violation of Rule 10b-5 of the federal securities law, 17 C.F.R. § 240.10b-5, and (6) violation of Pennsylvania's Insurance Bad Faith statute, 42 PA. CONS. STAT. ANN. § 8371.  (Doc. 1.)  Pursuant to a motion filed by Hartford on March 28, 2006, (see Doc. 16), the court dismissed plaintiffs' claims asserting a breach of the duty of good faith, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and violation of the Pennsylvania Insurance Bad Faith statute, (see Doc. 31).

On November 26, 2007, Hartford filed the instant motion for summary judgment.  (Doc. 59.)  Hartford claims that the statute of limitations lapsed on the

---

[7] The parties also appeared in one pre-hearing conference with a single arbitrator and two pre-hearing conferences before the full arbitration panel.  (Doc. 62, Ex. W, at 3.)

negligence and Rule 10b-5 allegations, as well as plaintiffs' assertion that Hartford breached the implied and express warranties of suitability in the December 2001 sale of the variable life insurance policies.  (Id. at 19.)  Hartford also alleges that collateral estoppel bars plaintiffs from asserting each of their claims.  (Id.)  Finally, Hartford argues that each asserted cause of action fails plaintiffs' prima facie requirements.  (Id.)  The motion has been fully briefed and is ripe for disposition.

## II.    **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See Fed. R. Civ. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also Fed. R. Civ. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

III.   **Discussion**

   A.   **Statute of Limitations**

Statutes of limitations are deadlines, the expiration of which foreclose a litigant's right to a hearing on the merits. "A statute of limitations generally begins to run when a cause of action arises or accrues." Novinger Group, Inc. v. Hartford Ins., Inc., 514 F. Supp. 2d 662, 668 (M.D. Pa. 2007). In the summary judgment posture, the lapse of the relevant statute of limitations is a matter of law for the court's adjudication unless the expiry or tolling of the limitations period requires resolution of factual issues. Hartford argues that the limitations period has expired on each of plaintiffs' remaining claims. The court will address these contentions *seriatim*.

   1.   **Negligent Supervision**

By purportedly allowing its agent, Harper, to engage in unethical sales practices, and by failing to implement oversight controls that would prevent such practices, plaintiffs contend that Hartford breached its duty "to insure that Harper acted within the boundaries of the law." (Id. ¶¶ 147-48.) Under Pennsylvania law, negligence claims are governed by a two-year statute of limitations.[8] 42 PA. CONS. STAT. § 5524(7). This limitations clock begins to tick when the injury in question is

---

[8] Plaintiffs' negligence claim is founded upon state law. The court's jurisdiction is based on diversity of citizenship. See 28 U.S.C. § 1332. As such, the court must apply Pennsylvania law in adjudicating the parties' rights. See Norfolk S. Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 91-92 (3d Cir. 2008). Neither party disputes the application of Pennsylvania law to this claim.

inflicted.  See Fine v. Checcio, 870 A.2d 850, 857 (Pa. 2005).  The parties appear to agree that, with respect to plaintiffs' negligence claim, the alleged injuries occurred when the sale of the variable life insurance policies and the Buy-Sell Policy was consummated in December 2001 and in April 2002, respectively.[9]  (See Doc. 1 ¶¶ 147-49; Doc. 60 at 20-22.)

The complaint was filed in the instant matter on January 24, 2006, well over three years after the Buy-Sell Policy was executed in April 2002.  (Doc. 1; Doc. 63 ¶ 44.)  Under an elementary computation of the two-year limitations period, plaintiffs' negligence cause of action had lapsed—and plaintiffs were foreclosed from a hearing on the merits—long before the complaint was filed.  See Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983) ("Once the prescribed statutory period has expired, the party is barred from bringing suit . . . ."); see also Murphy v. Diogenes A. Saavedra, M.D., P.C., 746 A.2d 92, 94 (Pa. 2000) (describing the claimant's duty to bring suit within the statutory period).  In fact, plaintiffs do not dispute that their complaint was filed over two years after the alleged injury arose; instead, plaintiffs contend that the statute of limitations was

---

[9] Plaintiffs do not pinpoint exactly when they believe the injuries in question occurred.  The crux of plaintiffs' negligence allegation is that Harper engaged in deceptive sales tactics leading up to the sale of the life insurance policies in December 2001 and April 2002.  (See Doc. 1 ¶¶ 147-49.)  Plaintiffs argue that Hartford had a non-delegable duty to supervise its agent and it was incumbent upon them to prevent Harper from selling its policies using deceptive sales methods.  (Id. ¶¶ 148-49.)  Assuming *arguendo* that Harper engaged in deceptive sales tactics, plaintiffs' ultimate injury plainly arose when it purchased the policies.  Thus, the date of sale is the *latest* date from which plaintiffs injury can be said to have accrued.

tolled until they reasonably could have discovered their injury.  (See Doc. 69 at 20-21.)

The "discovery rule" is a well-known exception to the straightforward temporal application of a negligence limitations period.  Pennsylvania courts have explained that "[t]he purpose of the discovery rule has been to exclude from the running of the statute of limitations that period of time during which a party who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured."  Fine, 870 A.2d at 858; Lesoon v. Metro. Life Ins. Co., 898 A.2d 620, 627 (Pa. Super. 2006).  Thus, in those situations in which a party cannot reasonably discover his or her injury, the limitations period is tolled until such time that the exercise of diligence would reveal the harm.  Crouse v. Cyclops Indus., 745 A.2d 606, 611 (Pa. 2000); Toy v. Metro. Life Ins. Co., 863 A.2d 1, 7 (Pa. Super. 2004).  However, application of the discovery rule is narrow, for "[t]here are very few facts which diligence cannot discover."  Fine, 870 A.2d at 858 (quoting Crouse, 745 A.2d at 611).  Litigants seeking refuge under the discovery rule's shelter bear the burden of demonstrating their exercise of reasonable diligence given the circumstances involved in the case.  See Vojtasek v. Diocese of Allentown, 916 A.2d 637, 641 (Pa. Super. 2006).

Plaintiffs' invocation of the discovery rule is nonsensical.  On March 13, 2003, Novinger Group filed its statement of claim with the NASD, requesting relief for Hartford's negligent supervision of its agent, Harper.  (See Doc. 62, Ex. U at 8-9.)  Thus, by March 2003, plaintiffs had not only discovered their claim, but were

actively prosecuting it.  Plaintiffs nonetheless failed to initiate the instant suit

against Hartford until January 2006, nearly three years after they identified their

negligent supervision claim and described it in detail to the NASD.  Consequently,

Hartford's motion for summary judgment on this claim will be granted.

### 2.   **Rule 10b-5 Securities Fraud**

Rule 10b-5 of the Securities Exchange Act of 1934 makes it unlawful for any

person to "employ any device, scheme, or artifice to defraud" or to "make any

untrue statement of a material fact or to omit to state a material fact . . . in

connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

Novinger Group[10] argues that Hartford committed securities fraud by failing to

provide them with vital financial information and creating a "false sense of

urgency" prior to sale of the variable life insurance policies in December 2001.  (See

Doc. 1 ¶¶ 152-53.)  Hartford contends that the statute of limitations period

applicable to Novinger Group's claim has expired.  (Doc. 60 at 20-22.)

A complaint under Rule 10b-5 "may be brought not later than the earlier

of . . . 2 years after the discovery of facts constituting the violation . . . or 5 years

after such violation."  28 U.S.C. § 1658(b).  Novinger Group filed the complaint *sub*

*judice* on January 24, 2006.  (Doc. 1.)  Thus, if Novinger Group knew of the basis for

its securities fraud claims prior to January 24, 2004, it is foreclosed from proceeding

on the merits.  See In re Merck & Co., Inc. Sec. Derivative & ERISA Litig., 543 F.3d

---

[10] James and Hospodavis are not parties to this claim.  (See Doc. 31 at 21
(dismissing James and Hospodavis for lack of standing)).

150, 160-61 (3d Cir. 2008) (discussing the limitations period under the Securities

Exchange Act).

As previously noted, Novinger Group delivered its statement of arbitration

claim to the NASD on March 13, 2003.  This arbitration claim specifically identified

Hartford's violation of Rule 10b-5 as a potential ground of relief.  (See Doc. 62, Ex. U

at 10-11.)  Thus, Novinger Group knew of the basis for its 10b-5 claim prior to

January 24, 2004, and plaintiffs' claim is time-barred.  Attempting to salvage this

potential cause of action, Novinger Group invokes the "inquiry notice" rule, which

delays the commencement of the limitations clock until a plaintiff, "in the exercise

of reasonable diligence, should have known of the basis for their claims."  Benak ex

rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400

(3d Cir. 2006) (quoting In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir.

2002)).  This contention fares no better than its argument for tolling the statute of

limitations, discussed above.  In March 2003, Novinger Group was not only on

notice of the basis for its securities fraud claim, but was actively attempting to

rectify the fraud of which it believed itself to be a victim.  Consequently, Novinger

Group's 10b-5 claim is untimely and summary judgment will be granted in favor of

Hartford.

### 3.      Breach of the Warranty of Suitability

Plaintiffs allege that Hartford breached implied and express warranties of

suitability.  (See Doc. 1 ¶¶ 124-26.)  Specifically, plaintiffs claim that, prior to the

finalization of the December 2001 and April 2002 sales, Harper represented that the

policies acquired by Novinger Group would achieve certain positive financial returns within a five year period. (See Doc. 69 at 23-24.) Relying on these assurances, plaintiffs proceeded to purchase the Hartford policies, which failed to perform as Harper predicted. (See id.) Plaintiffs contend that the unsuitability of the policies only became apparent after the plans were finalized and payments came due. (See id. at 24.) In light of these allegations, plaintiffs' suitability claim sounds in breach of contract.

Hartford argues that the statute of limitations on has expired with respect to the sale of the variable life insurance policies in December 2001.[11] Specifically, Hartford contends that the limitations period began to run at the time the variable life insurance policies were executed and delivered to plaintiffs in finalized form, in early January 2002. (See Doc. 60 at 22-24.) The statute of limitations on a breach of contract claim in Pennsylvania is four years.[12] 42 PA. CONS. STAT. § 5525. According to Hartford, the four-year period lapsed in early January 2006, several weeks prior to plaintiffs' filing date of January 24, 2006.

Invoking the discovery rule, plaintiffs argue that they could not reasonably ascertain the unsuitability of the Hartford policies until at least February 2002, when Hospodavis began to receive regular statements reflecting the financial

---

[11] Hartford implicitly concedes that plaintiffs' warranty claim is timely as it relates to the purchase of the Buy-Sell Policy in April 2002.

[12] Plaintiffs' breach of contract claim is also founded upon state law. See supra note 8. Neither party disputes the application of Pennsylvania law to this claim.

performance of the variable life insurance policies.  (See Doc. 69 at 14-15.); see also

Dalrymple v. Brown, 701 A.2d 164, 167 (Pa. 2007) (describing the discovery rule

exception in the breach of contract context).  Hartford counters this assertion by

pointing to the fact that the relevant terms underlying the insurance policies were

disclosed at the time the contracts were delivered in early January 2002, were

unaltered in the time period subsequent to delivery, and were thus ascertainable at

delivery through the exercise of reasonable diligence.[13]  (See Doc. 60 at 23-24.)

In a scenario potentially implicating the discovery rule, the "point at which

the injured party should reasonably be aware that he or she has suffered an injury

is generally an issue of fact to be determined by the jury."  Sadtler v. Jackson-Cross

Co., 587 A.2d 727, 732 (Pa. Super. 1991); Cochran v. GAF Corp., 666 A.2d 245, 248

(Pa. 1995).  "Only where the facts are so clear that reasonable minds cannot differ

may the commencement of the limitations period be determined as a matter of

law."  Baumgart v. Keene Bldg. Prods. Corp., 666 A.2d 238, 244 (Pa. 1995).  Here,

plaintiffs argue that technical terminology and confusing growth illustrations were

utilized by Harper during contract negotiations, and that these pre-sale terms

contradicted terms appearing in the policies executed in early January 2002.  (See

Doc. 69 at 14-16, 23-24.)  Plaintiffs explain their inability to discover these

contradictions at delivery by pleading ignorance of the meaning of various terms of

---

[13] Hartford also argues that because plaintiffs admittedly failed to review the
variable life insurance policies at the time of delivery, they are barred from tolling
the limitations period via the discovery rule.  (See Doc. 60 at 23 (citing Cooper v.
Sirota, 37 F. App'x 46, 49 (3d Cir. 2002) (rejecting party's invocation of the discovery
rule when she had failed to read the policies on delivery)).

art, which allegedly differed from the meaning conveyed by Harper's pre-sale usage of similar terminology.  (See id. at 13-15.)  Consequently, plaintiffs contend that it was not until February 2002—when they began to receive the regular financial statements—that the policies' exact financial behavior became apparent.

The court finds that the extent to which plaintiffs exercised reasonable diligence in order to discern whether the December 2001 insurance policies were suitable is a material fact in dispute.  Consequently, Hartford's request for summary judgment based upon an expiration of the statute of limitations will be denied.

### B.    Collateral Estoppel

"A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . ."  Montana v. United States, 440 U.S. 147, 153 (1979).  Collateral estoppel, also referred to as issue preclusion, specifically bars relitigation of an issue that was conclusively determined in a prior adjudication and that was essential to the original judgment.  Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1999); Venuto v. Witco Corp., 117 F.3d 754, 758 (3d Cir. 1997).  By foreclosing subsequent disputes over issues on which a court has ruled, collateral estoppel promotes fairness and certainty, while preventing the wasteful expenditure of resources upon issues already resolved through adversarial proceedings.  See Allen

v. McCurry, 449 U.S. 90, 94 (1980); Montana, 440 U.S. at 153-54; Witkowski, 173 F.3d at 198-99.

A federal court sitting in diversity in Pennsylvania must apply Pennsylvania law with respect to issue preclusion.  See Witkowski, 173 F.3d at 199; see also Greenleaf v. Garlock, Inc., 174 F.3d 352, 357 (3d Cir. 1999).  The Pennsylvania Supreme Court consults the Restatement of Judgments in order to delineate the contours of issue preclusion under state law.  See, e.g., Pa. State Univ. v. County of Centre, 615 A.2d 303, 306 (Pa. 1992); see also Shaffer v. Smith, 673 A.2d 872, 874-75 (Pa. 1996); Bortz v. Workmen's Comp. Appeal Bd., 683 A.2d 259, 261-62 (Pa. 1996).  According to the Restatement, "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."  RESTATEMENT (SECOND) OF JUDGMENTS § 27.

More specifically, Pennsylvania courts apply a four-part test derived from § 27 of the Restatement to determine whether collateral estoppel bars a potential claim.  An issue will be precluded if: (1) the issue decided in the prior adjudication was identical to the issue presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with the party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the applicable issue in the prior adjudication.  Witkowski, 173 F.3d at 199

(citing state court decisions); Kelley v. TYK Refractories Co., 860 F.2d 1188, 1194 (3d Cir. 1988) (same).  As this test makes clear, a party that was a non-participant in the first action may assert collateral estoppel "defensively" against a plaintiff bringing a second suit on an issue previously litigated and lost, so long as the plaintiff had a full and fair opportunity to litigate the issue in the first instance.  See RESTATEMENT § 29; see also Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 324 (1971).

In the action *sub judice*, no prior court of competent jurisdiction has adjudicated any of the issues currently before this court.  However, plaintiffs presented a nearly identical set of claims before the NASD arbitration panel, which issued a judgment on those claims in May 2006.  (See Doc. 62, Ex. W.)  Hartford argues that the findings of the arbitration panel represent a prior adjudication, precluding plaintiffs from relitigating identical issues in the instant forum.  (See Doc. 60 at 25-27.)  Under Pennsylvania law, "arbitration awards and their findings are considered final judgments for the purposes of collateral estoppel."  Witkowski, 173 F.3d at 199; Brody v. Hankin, 299 F. Supp. 2d 454, 459 (E.D. Pa. 2004) ("[A]n arbitration award, unless and until invalidated, creates or authoritatively declares rights even as a judgment does and further litigation of a claim submitted to an arbitrator is precluded by the entry of an award thereon."), rev'd on other grounds, 145 F. App'x 768 (3d Cir. 2005).  Thus, an arbitration award may collaterally estop litigation of identical claims.  Hence, the court will examine the particularities of

both the remaining claims and their prior prosecution within the rubric of the

Restatement § 27 test.

### 1  **Identity of Issues**

In the arbitration proceeding, plaintiffs characterized their suitability claim

as a "Breach of a Duty of Care of Suitability," thus styling the issue as one sounding

in negligence.  (<u>See</u> Doc. 62, Ex. U at 7.)  In the federal complaint, however,

plaintiffs characterize the suitability allegation as a "Breach of

Contract—Unsuitability."  (Doc. 1 at 24.)  Thus, a preliminary examination indicates

that the issues are not precisely identical.  Hartford's motion for summary

judgment argues that although the issues lack total identity, plaintiffs' suitability

claim is identical to that prosecuted in the prior arbitration.  Plaintiffs do not

dispute this contention and, if they disagree with Hartford's argument, they make

no attempt to vocalize their dissent.  In order to ensure proper application of the

law, however, the court will engage in a thorough analysis of the identity of issues

requirement, to determine whether the issues are "in substance the same," even if

the nomenclature used by plaintiffs' counsel is slightly dissimilar.  <u>See</u> <u>Raytech</u>

<u>Corp. v. White</u>, 54 F.3d 187, 192-93 (3d Cir. 1995); <u>Witkowski</u>, 173 F.3d at 203 ("Even

if there was not a precise identity of the 'cause of action' asserted, it would be of no

legal consequence; . . . . Only the issues need be the same.").

To aid the court's analysis, the Restatement identifies four factors to be

considered: (1) whether there is a substantial overlap between the evidence or

arguments required in the second proceeding and those advanced in the first, (2)

whether any new evidence or arguments involve an application of the same rule of law at issue in the prior proceeding, (3) whether pretrial preparation and discovery in the first adjudication reasonably should have embraced the issue sought to be presented in the second, and (4) whether the claims in the two proceedings are "closely related."  <u>See</u> Restatement § 27 cmt. c.  In sum, "[a] determination of whether two lawsuits are based on the same cause of action turns on the essential similarity of the underlying events giving rise to the various legal claims." <u>Churchill v. Star Enters.</u>, 183 F.3d 184, 194 (3d Cir. 1999) (quoting <u>Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Centra</u>, 983 F.2d 495, 504 (3d Cir. 1992)).

In the instant case, plaintiffs' suitability claim endeavors to hold Hartford liable for sales conduct engaged in by Harper, whose alleged misdeeds include: presenting misleading Powerpoint illustrations; ambiguously utilizing terms of art to mislead plaintiffs; and falsely certifying that he explained financial growth illustrations.  (<u>See</u> Doc. 69 at 12-15.)  When they were questioned regarding Hartford's alleged wrongdoing during the discovery phase of this litigation, each of Novinger Group's key executives pointed to misrepresentations made by Harper

during his sales pitch.[14]  (See Doc. 61, Ex. A at 101; Ex. B at 97-98, 108; Ex. D at 110.)
Furthermore, plaintiffs never identify the actions of a single Hartford
employee—other than Harper—as a basis for their suitability cause of action.

In the prior arbitration, plaintiffs' suitability claim was similarly focused
upon Harper's purportedly misleading conduct during the sale of the Hartford
policies.  Plaintiffs argued that Harper failed to notify Novinger Group of the
unsuitability of the insurance policy; that Harper failed to notify plaintiffs of the
specific charges and expenses associated with the policy; that Harper utilized "sales
talk," leaving plaintiffs ill-informed; that Harper failed to deliver the proper
prospectuses and employed false sales illustrations; and that Harper improperly
"rushed" plaintiffs into executing the policies.  (See Doc. 62, Ex. U at 7.)  Although
plaintiffs re-characterize their cause of action as a breach of contract in the federal
complaint, it is clear to the court that identical issues are implicated.  In the present
matter, plaintiffs allege that Hartford sold them unsuitable policies, that Hartford
failed to explain the policies' charges and expenses in a non-technical manner, that
Harper used improper "sales talk" to effectuate the sale, that no prospectuses were
ever provided, that the financial growth illustrations presented by Harper were

---

[14] For example, during his deposition, James was repeatedly questioned
regarding the alleged basis for Hartford's liability.  Time after time, James
responded with comments such as, "Hartford, through its agent, provided us with a
product that did not perform to the level that that agent represented"; "I don't
know if [Hartford was] misrepresenting anything.  I just stated in my complaint that
Rich Harper was the one who misrepresented and that he was Hartford's agent";
and "[T]hrough Rich Harper a promise of how well this plan would perform was
part of his sales pitch from the get-go, from the very beginning."  (Doc. 61, Ex. B at
97-98, 108.)

false, and that Harper created a "false sense of urgency" to consummate the sale. (See Doc. 1 ¶ 126.)  Thus, both complaints key upon misdeeds allegedly performed by Harper during the sale of the life insurance policies.

The court finds that these suitability claims focus on an identical set of facts raising an identical set of issues.  See Churchill, 183 F.3d at 194 (advising courts to examine the "essential similarity of the underlying events giving rise to the legal claims"); see also Raytech, 54 F.3d at 192-93 (inquiring whether issues that are dissimilar on the surface are "in substance the same").  Were the suitability issue to proceed in this court, the evidence and argument necessary for plaintiffs to prevail would be substantially the same as that required of them during the arbitration. See RESTATEMENT § 27 cmt. c (counseling courts to consider whether the evidence and arguments required in the second proceeding substantially overlap with those required in the first).  The issue plaintiffs seek to present in this proceeding—whether Harper sold plaintiffs Hartford policies that were unsuitable—has been adjudicated and plaintiffs are collaterally estopped from a second bite at the apple.

### 2.    Final Judgments on the Merits

Proper application of collateral estoppel requires that the issue in question was previously the subject of (1) a final judgment (2) on the merits.  See RESTATEMENT § 27.  Under Pennsylvania law, arbitration proceedings and their findings are final judgments for purposes of issue preclusion.  See Dyer v. Travelers, 572 A.2d 762, 764 (Pa. Super. 1990); Ottaviano v. Se. Pa. Transp. Auth.,

361 A.2d 810, 814-15 (Pa. Super. 1976).  Signatories to the arbitration agreement

may bargain for non-preclusive effect but, in the absence of such a provision, issues

that the arbitrator "actually and necessarily decided" are foreclosed from

relitigation because "the party against whom estoppel is invoked had full incentive

and opportunity to litigate the matter."  Frog, Switch & Mfg. Co. v. Pa. Human Rels.

Comm'n, 885 A.2d 665, 661 (Pa. 2005).  Plaintiffs do not contend that the arbitral

award lacked finality for purposes of issue preclusion; the court will nonetheless

conduct a thorough analysis.

Pennsylvania law considers an arbitration award to be "final" in either of two

circumstances.  Most obviously, an arbitral award is final when it has been

judicially confirmed.  See id.  State law also treats as final an unconfirmed award

from which no appeal is taken.[15]  Robbins v. Buck, 827 A.2d 1213, 1215 (Pa. Super.

---

[15] There is a paucity of Third Circuit case law on the issue preclusive effects
of unconfirmed arbitration awards.  However, the court is aware that some district
courts in this circuit have regarded unconfirmed arbitration awards as
adjudications lacking the finality necessary to preclude subsequent litigation on
identical issues.  See Gruntal & Co., Inc. v. Steinberg, 854 F. Supp. 324, 337 (D.N.J.
1994) (citing non-Third Circuit cases for support and applying federal preclusion
law to decide matter arising under the Federal Arbitration Act) ("Absent judicial
confirmation, an arbitration award will not result in a 'final judgment' and cannot,
therefore, have preclusive effect on a subsequent litigation."); see also Shtab v.
Greate Bay Hotel & Casino, Inc., 173 F. Supp. 2d 255, 261 (D.N.J. 2001) (citing
Gruntal and applying federal preclusion law to adjudicate matter arising under the
Family and Medical Leave Act).  The court's ruling in the instant matter,
characterizing the arbitration award as a "final judgment" on the merits, is not in
conflict with these decisions.  Erie principles require this court to apply substantive
state law, see Norfolk S. Ry. Co., 512 F.3d at 91-92, and Pennsylvania law is clear
with respect to its characterization of unappealed arbitration awards.  The above-
cited decisions have a divergent holding based upon a divergence of applicable law;
these courts were not considering the preclusive effect of an arbitration award
under Pennsylvania law.

2003); Ottaviano, 361 A.2d at 814-15 ("An unappealed from award is final and estops the party against whom it is made from proceeding further with the same cause of action." (quoting Romanovich v. Hilferty, 245 A.2d 701, 705 (Pa. Super. 1968)). In the instant matter, the arbitration award was not appealed; as such, it constitutes a final judgment for collateral estoppel purposes.

There is no question that the arbitration panel rendered a decision on the merits of the suitability issue. Plaintiffs' cause of action hinges solely upon conduct allegedly engaged in by Harper while he attempted to sell the Hartford insurance policies. See supra Part III.B.1. Moreover, plaintiffs do not dispute the fact that they contested the suitability of Harper's salesmanship during the arbitration. It is also undisputed that the arbitration panel issued a finding of no liability with respect to Harper's actions. (See Doc. 63 ¶ 55.) Thus, Harper's liability for these representations was squarely addressed on the merits during the arbitration and the arbitrator's award on this issue is preclusive upon this court. As the Third Circuit has explained,

> If the defendant's responsibility is necessarily dependent upon the culpability of another, who was the immediate actor, and who, in an action against him by the same plaintiff for the same act, has been adjudged not culpable, the defendant may have the benefit of that judgment as an estoppel . . . . [W]hen the plaintiff has litigated directly with the immediate actor the claim that he was culpable, and, upon the full opportunity thus afforded for its legal investigation, the claim has been adjudged against the plaintiff, there is manifest propriety, and no injustice, in holding that he is thereby concluded from making it the basis of a right of recovery from another who is not otherwise responsible.

<u>Witkowski</u>, 173 F.3d at 205-06 (quoting <u>C.S. Helmig v. Rockwell Mfg. Co.</u>, 131 A.2d 622, 628 (Pa. 1957)).

### 3.   **Plaintiffs were Parties to the Prior Adjudication**

In order to trigger the issue preclusive effect of a judgment, the party against whom collateral estoppel is asserted must have been a party or in privity with the party to the prior adjudication. RESTATEMENT § 27; <u>see also</u> <u>Balent v. City of Wilkes-Barre</u>, 669 A.2d 309, 313-14 (Pa. 1995). Plaintiffs do not dispute that they were a party to the prior arbitration. Rather, plaintiffs argue that Hartford "did not submit to the jurisdiction of the NASD," thereby foreclosing its attempt to take advantage of the arbitral findings in the instant proceedings. (<u>See</u> Doc. 69 at 23.) However, the fact that Hartford was not a party to the arbitration is irrelevant. "Mutuality of the parties, once the rule, has now been abolished in Pennsylvania, <u>Witkowski</u>, 173 F.3d at 200 n.10, and a non-party to the antecedent action is free to defensively invoke collateral estoppel *against* a party to the initial proceeding, <u>see</u> <u>Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick</u>, 587 A.2d 1346, 1348 (Pa. 1991); <u>In re Estate of Ellis</u>, 333 A.2d 728, 730-31 (Pa. 1975). Plaintiffs' active prosecution of the suitability issue in the arbitration binds them to that arbitral determination in this court.

### 4.   **Full and Fair Opportunity to Litigate**

Finally, application of collateral estoppel requires that the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in question in the prior adjudication. RESTATEMENT § 27; <u>Witkowski</u>, 173 F.3d

at 199.  Essentially, this is a due process requirement.  "A party does not have an

opportunity for a full and fair hearing when procedures fall below the minimum

requirements of due process as defined by federal law."  Witkowski, 173 F.3d at 205

(quoting Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1074 (3d Cir. 1990)).  An

arbitration proceeding affords a full and fair opportunity to litigate when it entails

the "essential elements of adjudication," including the right of parties to present

evidence and legal argument in support thereof.  RESTATEMENT § 83.  Plaintiffs

initiated the prior proceedings with the NASD by filing a complaint-like statement

of claims.  (See Doc. 62, Ex. U.)  Both Wachovia and Harper were afforded the

opportunity to offer pleadings in response.  (See Doc. 62, Ex. W at 1.)  Each party

was represented by counsel.  (Id.)  The proceedings lasted eight days and were held

before the full arbitration panel.  (See id. at 4.)  Live testimony, evidence, and

argument were presented.  (Id. at 1-4.)  Plaintiffs do not contend that these

procedures, for which they freely bargained, fell below the due process threshold.[16]

Plaintiffs sole contention with respect to the "full and fair opportunity"

requirement is that their "claims against [Hartford] in this action are based in large

part on documents discovered from [Hartford] in ongoing discovery."  (Doc. 69 at

23.)  Plaintiffs do not elaborate upon this contention and neglect to identify the

---

[16] In Gruntal, supra, the federal court declined to apply preclusive effect to a
prior arbitral award when the proceedings were conducted under the "simplified
arbitration procedure" of the NASD.  Gruntal, 854 F. Supp. at 338.  The simplified
procedure denied plaintiff the opportunity to defend the complaint on the merits
and provided no occasion to present testimonial evidence or oral argument.  Id.  In
stark contrast to the procedures described in Gruntal, those afforded plaintiffs in
the instant matter were akin to that of federal civil litigation.

documents upon which their instant claims rely, except to note parenthetically that

the "NASD does not permit depositions." (Id.) A review of the record indicates that

plaintiffs declined to depose a corporate representative from Hartford and, while

they did conduct two depositions of Harper during fact discovery in this matter, he

also provided twelve hours of live testimony during the arbitration proceeding.[17]

(See Doc. 61, Ex. C ¶ 32.) The suitability claim in this matter is based entirely upon

representations allegedly made by Harper to Novinger Group executives, each of

whom was available for testimony in the arbitration. Thus, plaintiffs had access

during the arbitration to all of the key players involved in the contested sales. The

mere fact that they were required to elicit testimony before the arbitration panel,

rather than via deposition, has no effect on plaintiffs' opportunity to fully and fairly

litigate their claim.

The court does not arrive at its determination without caution, however, and

is mindful of the Third Circuit's admonition against application of collateral

estoppel to arbitral awards absent extreme care. See Witkowski, 173 F.3d at 206

---

[17] Hartford contends that plaintiffs "cannot claim to have discovered [relevant documents] during the course of this litigation" because they were in possession of "all relevant Hartford documents" at the time of arbitration, including: Harper's Powerpoint presentations, the Hartford insurance contracts, and all of the illustrations and prospectuses supplied by Harper to Novinger Group executives during the sales. (See Doc. 74 at 14 & n.6.) Consequently, Hartford urges the court to reject plaintiffs' argument as "disingenuous." (Id. at 14 n.6.) In over thirty pages of pleadings defending against Hartford's motion for summary judgment, plaintiffs fail to address Hartford's contention and, further, fail to offer any detail on the information collected during discovery that was purportedly unavailable during arbitration. The court finds plaintiffs' omission troubling and thus accords little weight to plaintiffs' contention regarding "newly-discovered" documents.

(warning that doubts about collateral estoppel's application to arbitration awards "should usually be resolved against its use").  Procedures may vary from one arbitration procedure to the next, and arbitrators are bound neither by the prevailing case law or the applicable rules of evidence.  See, e.g., Universal Am. Barge Corp. v. J-Chem, Inc., 946 F.2d 1131, 1137 (5th Cir. 1991) (counseling courts to consider "the procedural adequacy of the arbitration proceeding").  Indeed, the basis of an award may be obscure and the claims actually decided in the arbitration unclear.  See, e.g., Postlewaitte v. McGraw-Hill, 333 F.3d 42, 48-49 (2d Cir. 2003).  Consequently, courts should ensure that an arbitration proceeding observed certain signposts of formality before applying estoppel.[18]  When procedures hew closer to traditional litigation, however, it is appropriate to afford preclusive effect to issues adjudicated in the arbitration.

The court has carefully examined the record to ensure that the prior arbitration was not only procedurally sufficient, but also resulted in a judgment deserving of preclusive effect.  Each party was permitted leave to file pre-arbitration pleadings with the arbitration panel.  Eight days of testimony and argument were presented, including twelve hours of testimony by Harper alone.  The panel of arbitrators produced a written opinion and the parties do not dispute the critical findings of this opinion.  Quite simply, this proceeding not only afforded

---

[18] Application of collateral estoppel to arbitral findings is generally a matter within the district court's discretion.  Even when each of the four elements of the Restatement test are met, a court may decline to apply collateral estoppel when doing so would result in a fundamental unfairness.  See RESTATEMENT § 28.

adequate due process, but required a substantial expenditure of time, money, and

manpower between parties in an adversarial posture.  By attempting to move

forward in this court with their suitability claim, plaintiffs seek a result inconsistent

with the findings of the arbitration panel.  This case presents the paradigm for

application of collateral estoppel.[19]  See Montana, 440 U.S. at 153-54.

---

[19] The procedures governing the NASD proceedings were those that plaintiffs
freely bargained for and, as one commentator has noted, "parties that insist on and
pay for an arbitration factfinding process that closely resembles factfinding in
litigation may legitimately expect to obtain the same issue preclusive effects that
would result from court adjudication."  G. Richard Shell, Res Judicata and
Collateral Estoppel Effects of Commercial Arbitration, 35 UCLA L. Rev. 623, 667
(1988).  Hartford has established that in the arbitration, plaintiffs litigated their
suitability claim.  Plaintiffs are collaterally estopped from revisiting this issue in
order to obtain a contrary result.

**IV.** <u>**Conclusion**</u>

In December 2001 and April 2002, plaintiffs purchased several variable life insurance policies from Hartford, through Hartford's agent, Richard Harper. For three years thereafter, plaintiffs engaged in adversarial arbitration with Harper and his employer, Wachovia. Plaintiffs' complaint seeks to relitigate the arbitral result with which they are dissatisfied. Plaintiffs negligence and 10b-5 claims are time barred. In addition, the arbitral adjudication is final. Plaintiffs are collaterally estopped from relitigating their contractual/warranty issues. The defendant is entitled to summary judgment as a matter of law.

An appropriate order will issue.

<u>  S/ Christopher C. Conner   </u>
CHRISTOPHER C. CONNER
United States District Judge

Dated:        December 23, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NOVINGER GROUP, INC., JAMES DAVID NOVINGER, and PATRICK D. HOSPODAVIS,** | : | **CIVIL ACTION NO. 1:06-CV-0188** |
| | : | |
| | : | **(Judge Conner)** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HARTFORD LIFE & ANNUITY INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant** | : | |

**<u>ORDER</u>**

AND NOW, this 23rd day of December, 2008, upon consideration of the

defendant's motion for summary judgment (Doc. 59), and for the reasons set forth in

the accompanying memorandum, it is hereby ORDERED that:

1. The defendant's motion for summary judgment (Doc. 59) is GRANTED.  <u>See</u> FED. R. CIV. P. 56(c).

2. The Clerk of Court is directed to enter JUDGMENT in favor of defendants and against plaintiff on all claims.

3. The Clerk of Court is directed to CLOSE this case.


   <u>S/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge